# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| ROGER KAHN, PAUL OPSOMMER, JOSEPH HAVEMAN, DAVID E. NATHAN, SCOTT DIANDA, CLARK HARDER, MARY VALENTINE, and DOUGLAS SPADE, | Case No.<br><br>Hon. |
| Plaintiffs, | |
| vs. | **COMPLAINT FOR DECLARATORY RELIEF AND A PERMANENT INJUNCTION** |
| JOCELYN BENSON, in her official capacity as Secretary of State, | |
| Defendant. | |

Plaintiffs Roger Kahn, Scott Dianda, Clark Harder, Joseph Haveman, David E. Nathan, Paul Opsommer, Douglas Spade, and Mary Valentine are Democrat and Republican former members of the Michigan Legislature who, with one exception, are now barred from running for their prior offices due to the term limits in Michigan's Constitution. Those term limits—the shortest in the nation and paired with a lifetime ban—violate Plaintiffs' federal constitutional rights and ensure a legislative body lacking experience, the quality that James Madison singled out in *The Federalist Papers* as essential to a competent and well-functioning legislature:

> No man can be a competent legislator who does not add to an upright intention and a sound judgment a certain degree of knowledge of the subjects on which he is to legislate. A part of this knowledge may be acquired by means of information which lie within the compass of men in private as well as public stations. Another part can only be attained, or at least thoroughly attained, *by actual experience in the station which requires the use of it. . . . The greater the proportion of new members, and the less the information of the bulk of the members the more apt will they be to fall into the snares that may be laid for them*. [James Madison, *Federalist No. 53* (1788) (emphasis added)].

Plaintiffs bring their Complaint for declaratory and injunctive relief against Defendant Jocelyn Benson, in her official capacity as Secretary of State, and allege as follows:

1

## INTRODUCTION

1.     This civil rights action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights secured by the First and Fourteenth Amendments to, and the Guarantee Clause of, the United States Constitution.

2.     In 1992, voters amended the Michigan Constitution to impose the most severe term limits for state legislative office in the nation.  In so doing, the State of Michigan created a system that wrongfully excludes qualified candidates like Plaintiffs from appearing on the state legislative ballot while denying an undetermined number of voters the opportunity to vote for the candidates of their choice.

3.     Restrictions on access to the ballot burden two distinct and fundamental rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Illinois State Bd. of Elections v Socialist Workers Party*, 440 U.S. 173, 184 (1979) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

4.     Michigan's system "creates barriers to candidate access to the . . . ballot, thereby tending to limit the field of candidates from which voters might choose." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). When a state electoral regime denies "some voters the opportunity to vote for a candidate of their choosing," it "has a real and appreciable impact on the exercise of the franchise." *Id.* at 144. "Many potential office seekers . . . are in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support." *Id.* at 143. "Not only are voters substantially limited in their choice of candidates," *id.* at 144, but that disparity falls disproportionately on those voters who desire to elect experienced candidates. Accordingly, the

law must be "closely scrutinized" and "found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." *Id.*

5.      In this way, ballot access restrictions like Michigan's implicate the right to vote— a right "of the most fundamental significance"—because "limiting the choices available to voters . . . impairs the voter's ability to express their political preferences." *Illinois State Bd. of Elections*, 440 U.S. at 184.

6.      The rights of individual voters to associate with, and vote for, the candidate of their choice "rank among our most precious freedoms." *Williams*, 393 U.S. at 30-31. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* at 31.

7.      Indeed, when "potential office seekers . . . [are] precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support, . . . [t]he effect of this exclusionary mechanism on voters is neither incidental nor remote." *Bullock*, 405 U.S. at 143–44 (1972).

8.      Michigan's term limits can survive *no* level of scrutiny.  Instead, the amendment has proven a failed social experiment: it has decreased the experience and competency of the legislature, decreased bipartisanship and coalition building, increased dynastic and recruitment-based representation, and increased the influence of lobbyists and special interest groups.

9.      Accordingly, Plaintiffs bring this action to remedy the constitutional violations created by Michigan's draconian term limits and to permanently enjoin those limits. They do so to vindicate their own rights to appear on the ballot, as well as their right to themselves vote for experienced candidates.

**PARTIES**

*Plaintiffs*

10.     Plaintiff Roger Newman Kahn was elected to and served as a Republican member of the Michigan House of Representatives, District 94, from January 1, 2004, through December 31, 2005. He was elected to and served as a Republican member of the Michigan Senate, District 32, from January 1, 2007, through January 1, 2015, when term limits prevented him from again appearing on the ballot as a candidate for the Michigan Senate. But for term limits, Senator Kahn would run for another term in the Senate. Senator Kahn was a well-regarded and effective Senator. Among many other things, Senator Kahn helped create Michigan's Government Efficiency Commission, sponsored Michigan's organ donation bill, prohibited the use of lead in children's toys, and banned texting while driving. He also received numerous awards for his public service, including legislator of the year honors from multiple organizations. Senator Kahn is also a registered Michigan voter.

11.     Plaintiff Scott James Dianda was elected to and served as a Democrat member of the Michigan House of Representatives, 110th District, where he served from January 1, 2013, through January 1, 2019, when term limits prevented him from again appearing on the ballot as a candidate for the Michigan House. But for term limits, he would again run for the Michigan House of Representatives. Representative Dianda was an effective advocate for his constituents, dealing with unemployment benefits, liquor licenses for small businesses, veteran affairs, Medicaid assistance, and tax assistance. His tenure was marked by nearly 500,000 miles on the road, traveling back and from to Lansing from the Upper Peninsula, and traversing six and a half counties in the western Upper Peninsula. Representative Dianda is also a registered Michigan voter.

12.     Plaintiff Clark Andrew Harder was elected to and served as a Democrat member of the Michigan House of Representatives, the 87th and 85th Districts, from January 1, 1991, through January 1, 1999, when terms limits prevented him from again appearing on the ballot as a candidate for the Michigan House. If not for being in the first group of term-limited legislators, Representative Harder would have run for reelection again. He had just become Chairman of the House Appropriations Subcommittee on Transportation in his final term, a key legislative position to directly influence policy decisions relating to transportation investments. Representative Harder sponsored the original legislation to impose double penalties for traffic moving violations in construction zones, school zones, and areas where emergency services workers are present; he was instrumental in what eventually became the Proposal A school funding reform proposal; and he played a key role in guaranteeing state funding to Greenfield Village, among other legislative accomplishments. Representative Harder is also a registered Michigan voter.

13.     Plaintiff Joseph H. Haveman was elected to and served as a Republican member of the Michigan House of Representatives, the 90th District, from January 1, 2009, through January 1, 2015, when term limits prevented him from again appearing on the ballot as a candidate for the Michigan House. After six years in office, Representative Haveman felt he had just hit his stride and had the experience and knowledge to know how to get things done. He certainly would run for office again but for term limits and believes that his constituents would have benefitted from more experience and continuity. During Representative Haveman's tenure, he secured funding for a new airport terminal in his community and started the first Agriculture Business Incubator in Michigan. He also helped initiate a new jail pre-release education program. Most important, he led a paradigm shift in the Legislature toward criminal-justice reform. Representative Haveman is also a registered Michigan voter.

14.     Plaintiff David E. Nathan was elected to and served as a Democrat member of the Michigan House of Representatives, 8th District, from January 1, 2009, to January 1, 2015, when term limits prevented him from again appearing on the ballot as a candidate for the Michigan House. But for Michigan's term limits, he would again run for that office.  Representative Nathan was instrumental in introducing H.R. 4844, which required insurers to deal with injured persons in good faith, and permitted recourse against insurers for a breach of that duty.  Representative Nathan is also a registered Michigan voter.

15.     Plaintiff Paul Edward Opsommer was elected to and served as a Republican member of the Michigan House of Representatives, 93rd District, from January 1, 2007, to January 1, 2013, when term limits prevented him from again appearing on the ballot as a candidate for the Michigan House. But for Michigan's term limits, he would again run for that office. Representative Opsommer helped enact Michigan's Right to Work legislation, its Energy Efficiency Law, and a reform to the Urban Cooperation Act, as well as a repeal of the former motorcycle-helmet law. Notwithstanding those accomplishments, he felt that he left behind much work that still needs to be finished, including improving incentives for local governments to eliminate duplicative services and to assist adoptive families working with the Michigan Department of Health & Human Services. Representative Opsommer is also a registered Michigan voter.

16.     Plaintiff Douglas J. Spade was elected to and served as a Democrat member of the Michigan House of Representatives, 57th District, from January 1, 1999, through January 1, 2005, when term limits prevented him from again appearing on the ballot for the Michigan House. But for Michigan's term limits, he would again run for that office. Representative Spade had a strong focus on constituent service, cutting through bureaucratic red tape to resolve problems for the people and businesses he represented. Among other things, he persuaded Treasury that a local

orchard was being improperly taxed, expedited an elderly man's desperately needed refund, and removed roadblocks placed unnecessarily on a local school-gym construction project. Mr. Spade is also a registered Michigan voter.

17.     Plaintiff Mary Hostetler Valentine was elected to and served as a Democrat member of the Michigan House of Representatives, 91st District, from January 1, 2007, through January 1, 2011. Ms. Valentine is still eligible to run for the Michigan House for one additional two-year term but thinks that term limits are unfair to legislators and destructive to the functioning of the Legislature. Ms. Valentine worked to ban smoking in Michigan's restaurants, introduced and helped enact a law providing more stability in foster care by allowing them to continue attending school in their home district if their foster parents would provide transportation, and helped many constituents facing foreclosure and the denial of unemployment-insurance benefits. Ms. Valentine is also a registered Michigan voter.

*Defendant*

18.     Defendant Jocelyn Benson is the Secretary of State of Michigan ("Secretary Benson") and is named in her official capacity.  Secretary Benson is the public official primarily responsible for implementing and administering the state constitutional law that is the subject of this action.

## JURISDICTION AND VENUE

19.     This civil rights action arises under the First and Fourteenth Amendments to the United States Constitution and under federal law, 42 U.S.C. § 1983.

20.     This Court is vested with original jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 1343.

21.     This Court further has subject matter jurisdiction over any supplemental state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

22.     Venue in this Court is proper under 28 U.S.C. § 1391, because all or substantial part of the events or omissions giving rise to the claims herein occurred within this district and because Defendant has an office located in Ingham County, which is in the United States District Court, Western District for the State of Michigan.

23.     Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rule 57 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

## FACTUAL ALLEGATIONS

### A. Article IV, Section 54 of the Michigan Constitution

24.     In 1992, Michigan voters amended the Michigan Constitution to impose lifetime term limits on state legislators – limiting state representatives to three, two-year terms (a total of six years) and state senators to two, four-year terms (a total of eight years). Mich. Const. art. IV, § 54. These terms limits are the most restrictive in the country, combining the nation's shortest legislative terms with a lifetime ban.

25.     As part of that initiative, voters also unconstitutionally attempted to impose term limits on United States congressional seats. The U.S. Supreme Court has already invalidated those federal limits. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).

26.     Of the 15 states that impose term limits on state legislators, Michigan's limits are the most restrictive.[1]  For example, nine of the 15 states impose only consecutive—rather than lifetime—limits on legislators.[2]  And for the six states that impose lifetime limits, Michigan imposes the fewest number of years for which an elected representative may serve.[3]

**B.  Michigan's Term Limits Do Not Achieve Their Intended Purposes**

27.     While supporters of the amendment decried so-called "career politicians", the reality is that Michigan's term limits proved not only ineffective to address that concern, but also harmful to Michigan governance.

28.     In 2014, Michigan's term limits forced 34 lawmakers from office with a combined 248 years of experience, including the Senate Majority Leader, Senate Minority Leader, and House Speakers.[4]

29.     Likewise, in 2019, Michigan's term limits forced out of office nearly 70% of state senators and more than 20% of state representatives.[5]

30.     Proponents of term limits posited that such sweeping change would be a positive development—promoting less emphasis on reelection efforts, reducing the influence of lobbyists and special interest groups, and promoting diversity and new ideas.

31.     But research demonstrates that the proponents' hypotheses failed.

---

[1] Other states have passed laws regarding term limits, but those laws have either been repealed or struck down.     *See The Term-Limited States*, http://www.ncsl.org/research/about-state-legislatures/chart-of-term-limits-states.aspx.
[2] *Id.*
[3] *Id.*
[4] *Term limit turnover: Michigan losing 248 years of legislative experience this year*, MLive (Dec. 31, 2014), available at http://www.mlive.com/lansing-news/index.ssf/2014/12/term_limit_turnover_michigan_l.html.
[5] *Mass turnover fuels push for Mich. term limit reform*, The Detroit News (Oct. 3, 2017), available at   https://www.detroitnews.com/story/news/politics/2017/10/03/michigan-chamber-term-limits-reform/106253436/

32.     First, term limits incentivize politically-ambitious legislators to use their short legislative experience as a kind of springboard to another office—which intensifies, not diminishes, their focus on reelection-centric efforts.[6]

33.     Indeed, after the imposition of term limits, politically-ambitious legislators spent more time on reelection-centric efforts—like procuring pork for their districts—and less time on actually legislating—like studying legislation, developing new legislation, and building coalitions across party lines.[7]   Actual legislation was found to be most commonly within the purview of experienced or veteran legislators.[8]

34.     Likewise, freshmen legislators not only spend less time post-term-limits building bipartisan coalitions, but less time building coalitions within their own parties.[9]

35.     That lack of institutional knowledge and coalition building among inexperienced legislators means that legislators often turn to external, rather than internal, sources for information when voting on policy: lobbyists and special interest groups.[10]

36.     As one authority explains:

The big change in the [Michigan] Senate is the rising importance (a 24% increase) of organized groups and lobbyists as trusted sources during floor votes.  Nearly twice the proportion of post-term-limits senators turns to organized groups and lobbyists as their most important source compared to the proportion rating colleagues most important.  Organized groups and lobbyists displace local sources as the most important ones for post-term-limits senators . . . .

*** 

Lost access for local sources is noteworthy because term limits proponents claimed that with limits on their tenure elected officials would be more closely tied to their constituents and their districts.  We find no evidence of this—indeed, the changes

---

[6] Marjorie Sarbaugh-Thompson & Lyke Thompson, *Implementing Term Limits: The Case of the Michigan Legislature* (2017), pp. 277-278 (hereinafter, "Thompson").
[7] *Id.* at p. 277.
[8] *Id.* at p. 314.
[9] *Id.* at 283.
[10] *Id.* at p. 447.

we find are often in the opposite direction.  The consulting patterns that evolve in the Senate after term limits often attenuate the ties that term limits advocates wanted to cultivate (local sources) and strengthen the ones they wanted to sever (organized groups and lobbyists).  That this occurs at the expense of local sources and of colleagues demonstrates a shift in access and influence for key actors in Michigan's policy-making process. [*Id.* at pp. 478-479, 492-493].

37.     Nor do term limits promote diversity or fresh ideas.

38.     Instead, term limits have increased a kind of dynastic representation—where relatives of term-limited incumbents seek to capitalize on name recognition—and recruitment of particular candidates.

39.     For example, in 2016 alone, *13* races involved a spouse, sibling, or other relative of a current candidate—and that was in addition to the *16* other seats already held by a former incumbent's family member.[11]

40.     Likewise, recruiting particular candidates—including family and staff members of incumbents—significantly *increased* after the imposition of term limits.[12]

41.     And the kind of candidates recruited by party incumbents is significant.  For example, after the imposition of term limits, the Democratic Party significantly increased its candidate recruiting efforts, and those efforts targeted white men significantly more than women and people of color, when compared to recruiting efforts pre-term-limits.[13]

42.     Thus, "merely increasing the number of open seats does not diversify state legislatures."[14]

---

[11] Jack Lessenberry, *Our system of term limits in Michigan is an utter failure*, Michigan Radio (May 10, 2016), available at http://michiganradio.org/post/ our-system-term-limits-michigan-utter-failure
[12] *Supra* n. 6, Thompson, p. 134.
[13] *Id.* at pp. 138-140.
[14] *Id.* at 142.

43.     In short, term limits have proved a "failed social experiment."[15]

**C.     The Particularized Harm of Term Limits on Plaintiffs**

      **1.     Roger Kahn**

44.     Mr. Kahn has served the State of Michigan in several capacities. First, in 2002, voters elected Mr. Kahn to serve as the Saginaw County Commissioner, in which position he served until 2004.

45.     Mr. Kahn was then elected to the state House in November 2003, and he served as a representative from January 1, 2004 through December 31, 2005.

46.     Mr. Kahn was then elected to the state Senate in November 2005, where he served from January 1, 2007 until he was term-limited out of office on January 1, 2015.

47.     During his time in the Senate, Mr. Kahn served in numerous leadership roles, including as the Chairman of the Department of Community Health, Vice Chairman of the Department of Human services, and Vice Chairman of the Corrections Appropriations budgets.

48.     In those roles, Mr. Kahn successfully legislated for his constituents and the State of Michigan.

49.     For example, Mr. Kahn helped secure the passage of Public Act 123 of 2007, which added Saginaw County to Healthy Kids Dental. As part of that Act, the children of Saginaw County received an estimated $3.2 million in dental services.

50.     Mr. Kahn also ensured the restoration of funding to the Special Needs Vision Clinic, which provides eye care services to the underprivileged and physically and mentally disadvantaged.

---

[15] *Michigan Term limits a "failed social experiment*," The Detroit News (April 18, 2017), available at http://www.detroitnews.com/story/news/politics/ 2017/04/18/meekhof-mich-term-limits-failed-social-experiment/100599820/.

51.     Mr. Kahn was also instrumental in securing funding for numerous projects and programs, including replacing the Shiawassee River Dam, construction of the Saginaw Valley Health Science Complex, improving access to care for pregnant women, children, and seniors, completion of the Frank N. Anderson Recreational Complex in Liberty Park, which houses a handicapped accessible playing surface, securing funding for traumatic brain injury care and restoring adult dental and podiatric services to Medicaid, improving portions of M57, M47, and M81.

52.     Notably, Mr. Kahn spearheaded an increase in Early Childhood Funding of $65 million per year for the 2014 and 2015 General Fund budget, which was the largest investment increase in early childhood education in the nation in both of the next two years.  This included funding for a kindergarten entry assessment tool and the Quality Rating Improvement System in daycare, ensuring that vulnerable and dependent children receive higher quality care and education.

53.     Mr. Kahn was also instrumental in the passage of numerous bills that made Michigan residents safer, including Public Act 159 of 2007, which prohibits a person or company from using or applying lead-based substances on any toy or child care article, Public Act 59 of 2010, which made it a primary offense for reading, writing, or sending a text message while driving, Public Act 23 of 2010, which requires hospitals to establish a seasonal influenza immunization policy, including procedures for identifying and offering the vaccine to at-risk individuals, Public Act 153 of 2011, which created a statewide firefighter training program for high school students, and Public Act 107 of 2013, which provided access to health care for over 400,000 previously uninsured Michigan residents.

54.     And Mr. Kahn's efficacy as a Senator only increased as his experience increased. During his second term, and as Chairman of the Senate Appropriations Committee, Michigan's budgets were passed and signed into law for four consecutive years by June, the first time that the state budget was timely passed for four consecutive years since approximately 1990.

55.     Even in his short time in office, Mr. Kahn's service earned him statewide recognition, including receiving the Michigan Non Profit Champion Award in 2014, Heroes of Breast Cancer Leadership Award—Karmanos Cancer Institute 2013, Senator of the Year by MIRS News 2012, Michigan Association of Community Mental Health 2011, Michigan Association of Local Public Health 2011, Action Award from Elder Law of Michigan 2011, Heroes for Michigan's Children Seasoned Advocate Award 2009, Legislator of the Year—Michigan Council for Maternal and Child Health, Legislator of the Year—Fraternal Order of Police 2008, and being named the Best Committee Chairman in 2014.

56.     But for Michigan's term limits, Mr. Kahn would have run for a third term in the state Senate and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

57.     Mr. Kahn has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

**2.      Scott Dianda**

58.     Mr. Scott Dianda was elected to the state House as representative for the 110th District in November 2012, where he served until he was term-limited out of office on January 1, 2019.

59.     While most Michigan citizens may believe that being a legislator entails drafting and passing legislation, the duties of being a state legislator requires so much more. Mr. Dianda's proudest moments as state representative came from his ability to help his constituents navigate their government and to provide assistance during times of crisis.

60.     During Mr. Dianda's tenure, the bulk of his constituent case load dealt with unemployment benefits, liquor licenses for small businesses, veteran affairs, Medicaid assistance, and tax assistance. Constituents would often correspond with his office whether in Lansing or in-district seeking help on their issues that seemed to be going nowhere with various departments and in most instances, his office could provide assistance and resolve most cases successfully.

61.     Mr. Dianda also helped his constituents through times of crisis. This includes everything from natural disasters, economic travesties, and other dangerous situations. In particular, he helped lead on a propane shortage crisis and a natural gas line break during the winter and major flooding in Houghton County. His experiences and contacts with local, state, and national leaders came together during these times of crisis to help his constituents were invaluable.

62.      Mr. Dianda's time serving in the Michigan Legislature was marked by nearly 500,000 miles on the road, traveling back and forth to Lansing from the Upper Peninsula, and traversing six and a half counties in the western UP.

63.     But for Michigan's term limits, Mr. Dianda would have run for an additional term in the state House and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator

experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

64.     Mr. Dianda has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 3.     Clark Harder

65.     Mr. Clark Harder was elected to the state House as representative for the 87th district in November 1990, where he served from January 1, 1991, through January 1, 1993. Mr. harder was elected to the state House as representative of the 85th district in November 1992, where he served from January 1, 1993, through January 1, 1999, until term-limited out of office.

66.     If not for being in the first group of term-limited legislators, Mr. Harder would have run for reelection in 1998. He had just become Chairman of the House Appropriations Subcommittee on Transportation in his final term of 1997-98, and this was a key legislative position that appealed to his personal interests and afforded him an excellent oversight opportunity to benefit his constituents who had placed their trust in him in four elections. He was in a position to directly influence policy decisions relating to transportation investments that had, and would have continued, to benefit his district as well as the entire state of Michigan.

67.     Mr. Harder was the sponsor of the legislation to increase the state gasoline tax by 4 cents in 1997, the only tax increase during the Engler Administration years, which lead to expanded investment in Michigan's transportation infrastructure.

68.     Mr. Harder sponsored the original legislation that became law to impose double penalties for traffic moving violations in construction zones, school zones and areas where emergency services workers are present.

16

69.     Mr. Harder was the sponsor, in 1990, of the original legislation which later became the cornerstone of Proposal A for school funding reform.

70.     As Co-Chair of the Public Retirement Committee, during the two years of dual-party House control, Mr. Harder lad the House effort to oppose the discontinuation of the "Defined Benefit" retirement plan for state employees, and reductions to public employee pension funds.

71.     As Chairman of the Appropriations Subcommittee on Transportation, Mr. Harder opposed privatization of Michigan's state's highway maintenance and called on MDOT to provide detailed reports on the road maintenance schedules for all state and interstate highways.  He was also instrumental in guaranteeing state funding to Greenfield Village for the restoration of the Marshall Roundhouse as an operating historic building as part of the Village's railroad; while also working to identify and fund the current Amtrak station at Greenfield Village and the Henry Ford where thousands of tourists and school children every year learn more about Michigan's transportation history.

72.     As ranking Democrat of the House Higher Education Committee, Mr. Harder led the effort at negotiating more stringent rules for university presidential searches, including allowing for certain aspects of searches to be done in closed sessions, thus helping to guarantee that our institutions of higher education have the opportunity to draw upon the best qualified candidates

73.     And, though not passed into law, Mr. Harder was also proud to sponsor legislation to require that Michigan History be included in the state's high school curriculum requirements, and he sponsored the first legislation to require that concert promoters be required to acknowledge when an event billing for a popular artist was not the original performer.

74.     But for Michigan's term limits, Mr. Harder would have run for an additional term in the state House and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

75.     Mr. Harder has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 4.     Joseph Haveman

76.     Mr. Haveman was elected to the state House as representative for the 90th District from January 2, 2009 until December 31, 2014, when he was term-limited out of office.

77.     After six years, Mr. Haveman felt he had just hit his stride in the legislature, accompanied with the knowledge, experience, and relationships to successfully perform his role.

78.     During his terms, Mr. Haveman served several important roles, from serving as the Chairman of the House Appropriations Committee for two years and acting as a member of the leadership team for four years.

79.     Mr. Haveman also succeeded for his constituents.  During his last term, he helped secure funding for a new airport terminal in his community, as well as started the first Agriculture Business Incubator.

80.     Mr. Haveman was also instrumental in beginning to lead the paradigm shift in the Republican Party with respect to justice reform.  He assisted in beginning a new jail pre-release education program, called Exit in Muskegon, and began to observe how policies of past decades resulted in an expensive and unsustainable justice system.  Mr. Haveman was not able to

accomplish justice reform in his short time in office, but believes that, with additional terms, he could have aided in positive policy changes.

81.     But for Michigan's term limits, Mr. Haveman would have run for state House again, and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

82.     Mr. Haveman has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 5.     David E. Nathan

83.     Mr. Nathan was elected to the state House as representative for the 8th District in November 2008, where he served until he was term-limited out of office on January 1, 2016.

84.      During his terms, Mr. Nathan was instrumental in seeking to protect Michigan's injured insured from unscrupulous practices.

85.     Specifically, Mr. Nathan introduced and aided in securing the passage in the House of Representatives of H.R. 4844.

86.     H.R. 4844 imposed a duty on insurers to deal with injured persons in good faith, and permitted injured persons to sue insurers who violated that duty for compensatory, consequential, and punitive damages.

87.     But for Michigan's term limits, Mr. Nathan would have run for state House again, and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

88.     Mr. Nathan has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 6.     Paul Opsommer

89.     Mr. Opsommer was elected to the state House as representative for the 93rd District in November 2006, where he served until he was term-limited out of office on January 1, 2013.

90.     During his time as a Representative, Mr. Opsommer was instrumental in several key pieces of legislation, including PA 349 of 2012, which established Michigan as a right-to-work state and prohibited mandatory participation in a collective bargaining agreement as a condition of employment

91.     Mr. Opsommer also played a key role in the enactment of PA 242 of 2009, which provided funding to public and private entities for efficiency and renewable energy projects.

92.     Upon being term-limited out of office, Mr. Opsommer still believed there was much work to be finished, including improving incentives for cities and townships to combine services, assisting the city of St. Johns as it worked toward establishing a Fire Authority with surrounding townships, improving transit agency services, and assisting numerous adoptive families who were unhappy with the services provided by DHHS.

93.     But for Michigan's term limits, Mr. Opsommer would have run for state House again, and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

94.     Mr. Opsommer has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with

significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 7. Douglas Spade

95.     Douglas Spade was elected to the state House as representative for the 57th District from January 1, 1999, until January 1, 2005, when he was term-limited out of office.

96.     During his time as an elected representative, Mr. Spade placed particular emphasis on constituent needs.

97.     For example, Mr. Spade ensured that the state Treasury acknowledge that a local orchard was improperly taxed, expedited an elderly constituent's much-needed refund, and removed unnecessary roadblocks to the construction of a new school gym.

98.     But for Michigan's term limits, Mr. Spade would have run for state House again, and believes his constituents would have benefitted from his experience and continuity. If allowed to run again, he would emphasize that the diminishment of legislator experience and increase of power among lobbyists and bureaucrats has been harmful to Michigan's government.

99.     Mr. Spade has also lost the ability to vote for term-limited candidates in the districts where he lives. If Michigan's term limits are invalidated, he would favor candidates with significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

### 8. Mary Valentine

100.    Ms. Valentine was elected to the state House as representative for the 91st District in November 2006, where she served until January 1, 2011. Although Ms. Valentine was not term limited, she believes that Michigan's term limits are unfair to legislators and destructive to good government in Michigan.

21

101.    Ms. Valentine voted and worked for the legislation that banned smoking in restaurants, which has saved many lives and will save many lives in the years to come.  She was part of a group that worked with her caucus to assure that legislation was brought up for a vote.

102.    Ms. Valentine was proud of her work as chair of Family and Children services. One bill she introduced and passed into law provided more stability to children in foster care by allowing them to continue in their home school district if their foster parents would provide transportation.

103.    Regarding constituent services, Ms. Valentine worked to keep citizens in their homes when they faced foreclosure.  Additionally, she helped several people receive unemployment insurance when they were denied it unfairly and unlawfully.  When the prison did not re-evaluate an inmate, Ms. Valentine worked to assure that person received an updated evaluation, according to their legal rights.  Ms. Valentine helped a constituent work with their insurance company to assure they received a ramp to which they were entitled to for their severely injured child.

104.    Ms. Valentine was very proud of her staff for working diligently and successfully with constituents in our district, including putting a woman whose home was a shamble in touch with a realty company to do a complete remake of her home.  Her staff also resolved many thorny issues by listening carefully to and working with constituents.

105.    Ms. Valentine also helped a group of students come to Lansing to advocate for the Michigan Promise; they were able to talk to all of the leaders at that time, helping them gain confidence to work with legislators in the future.

106.    Ms. Valentine has lost the ability to vote for term-limited candidates in the districts where she lives. If Michigan's term limits are invalidated, she would favor candidates with

significant legislative experience because their election would minimize the power of lobbyists and bureaucrats.

## COUNT I
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
### (BALLOT ACCESS)

107.    Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

108.    The First and Fourteenth Amendments to the United States Constitution guarantee the freedom to join together in furtherance of common political beliefs, commonly referred to as the freedom of association, and also protect the expression of that association—including the selection of a candidate of one's choice.

109.    Where, as here, a law interferes with the ability of both individuals and political parties to select the candidate of their choice, it imposes a severe restriction on ballot access such that the law must survive strict scrutiny review.  *Ill. State Bd. of Elections*, 440 U.S. at 184.

110.    Accordingly, the law must be narrowly drawn to advance a state interest of compelling importance. *Burdick v. Takushi*, 504 U.S. 428, 434 (1982).

111.    But even if a law imposes a lesser burden, the Court must assess whether alternative methods would advance the proffered governmental interests.

112.    Mich. Const. 1963, art. IV, § 54 cannot satisfy any level of scrutiny.

113.    Michigan's term limits do no serve a compelling state interest and are not narrowly tailored to achieve that interest, nor do they satisfy any lower level of scrutiny—as evidenced by the numerous states that have imposed less-restrictive limitations.

114.    In fact, Michigan's term limits have proven not to serve the proffered interests at all—and actually result in exacerbation of the concerns that term limits were purportedly supposed to redress.

115.      Nor can the savings clause contained in Mich. Const. 1963, art. IV, § 54 save the amendment.

116.      The savings clause applies only to § 54: "If any part of *this section* is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect." *Id.* (emphasis added).

117.      A savings clause cannot resuscitate an unconstitutional amendment, particularly where, as here, there would be nothing left.  The entire purpose of § 54 is to impose term limits on State representatives and senators and, if those limits are struck down, as they should be, there are no "remaining parts of [§ 54]."

## COUNT II
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
## (FREEDOM OF ASSOCIATION)

118.      Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

119.      The rights of individual voters to associate with, and vote for, the candidate of their choice "rank among our most precious freedoms." *Williams*, 393 U.S. at 30-31. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* at 31.

120.      Indeed, when "potential office seekers . . . [are] precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support, . . . [t]he effect of this exclusionary mechanism on voters is neither incidental nor remote." *Bullock*, 405 U.S. at 143-144.

121.      Mich. Const. 1963, art. IV, § 54 denies voters the opportunity to participate on an equal basis with other voters in the election of their choice of representative, and denies such voters the ability support an entire class of candidates—experienced legislators.

122.      Mich. Const. 1963, art. IV, § 54 further imposes a content-based restriction on which candidates voters may support.  A majority determined that a single trait—legislative

experience—is so undesirable that all candidates who share that trait should be barred, and all voters wishing to support such candidates prohibited from doing so.

123.     The premises on which Mich. Const. 1963, art. IV, § 54 are based have proven hollow.  Michigan's term limits have decreased the experience and competency of the legislature, decreased bipartisanship and coalition building, increased dynastic and recruitment-based representation, and increased the influence of lobbyists and special interest groups.

124.     That Michigan voters crave experienced legislators is no more evident than voters' tendency to elect family members of term-limited incumbents.

125.     As set forth herein, the First and Fourteenth Amendments to the United States Constitution guarantee the freedom to joint together in furtherance of common political beliefs, commonly referred to as the freedom of association, and also protect the expression of that association—including the selection of a candidate of one's choice.

126.     Where, as here, a law interferes with the ability of both individuals and political parties to select the candidate of their choice, it imposes a severe restriction on ballot access such that the law must survive strict scrutiny review.  *Ill. State Bd. of Elections*, 440 U.S. at 184.

127.     Accordingly, the law must be narrowly drawn to advance a state interest of compelling importance. *Burdick*, 504 U.S. at 434.

128.     But even if a law imposes a lesser burden, the Court must assess whether alternative methods would advance the proffered governmental interests.

129.     Mich. Const. 1963, art. IV, § 54 cannot satisfy any level of scrutiny.

130.     Michigan's term limits do no serve a compelling state interest and are not narrowly tailored to achieve that interest, nor do they satisfy any lower level of scrutiny—as evidenced by the numerous states that have imposed less-restrictive limitations.

131.     In fact, Michigan's term limits have proven not to serve the proffered interests at all—and actually result in exacerbation of the stated concerns.

132.     Nor can the savings clause contained in Mich. Const. 1963, art. IV, § 54 save the amendment.

133.     The savings clause applies only to § 54: "If any part of *this section* is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect." *Id.* (emphasis added).

134.     A savings clause cannot resuscitate an unconstitutional amendment, particularly where, as here, there would be nothing left.  The entire purpose of § 54 is to impose term limits on State representatives and senators and, if those limits are struck down, as they should be, there are no "remaining parts of [§ 54]."

## COUNT III
## VIOLATION OF THE GUARANTEE CLAUSE

135.     Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

136.     Article IV, section 4 of the United States Constitution provides that "The United States shall guarantee to every State in this Union a Republican form of government."

137.     The United States Supreme Court has recognized that some claims under the Guarantee Clause present nonjusticiable questions.  *New York v. United States*, 505 U.S. 144, 185 (1992).  But "the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions," and "[c]ontemporary commentators have . . . suggested that courts should address the merits of such claims, at least in such circumstances." *Id.* at 185 (citing L. Tribe, *American Constitutional Law* 398 (2d ed. 1988), J. Ely, *Democracy and Distrust: A Theory of Judicial Review* 118 & nn. 122–23 (1980), and W. Wiecek, *The Guarantee Clause of the U.S. Constitution* 287–89, 300 (1972), among others).

138.     Here, Michigan's term limits have created a less professional, less organized, and less competent Legislature.  As authorities recognize, "term limits strip legislatures of experience and expertise, partially deinstitutionalizing them."[16] And in states with less professional legislatures, lobbyists are a more prominent source of information—as research has demonstrated is the case since Michigan imposed term limits.[17]

139.     Accordingly, by destabilizing and deinstutionalizing Michigan's Legislature, Mich. Const. 1963 art. IV, § 54 violates the right to a republican form of government, as guaranteed by the United States Constitution.

140.     Nor can the savings clause contained in Mich. Const. 1963, art. IV, § 54 save the amendment.

141.     The savings clause applies only to § 54: "If any part of *this section* is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect."  *Id.* (emphasis added).

142.     A savings clause cannot resuscitate an unconstitutional amendment, particularly where, as here, there would be nothing left.  The entire purpose of § 54 is to impose term limits on State representatives and senators and, if those limits are struck down, as they should be, there are no "remaining parts of [§ 54]."

## COUNT IV
## VIOLATION OF MICH. CONST. 1963, ART. IV, § 24

143.     Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

144.     Mich. Const. 196, art. IV, § 24 provides that "[n]o law shall embrace more than one object, which shall be expressed in its title."

---

[16] *Supra* n.6, Thompson, p. 444.
[17] *Id.*

145.    When Proposal B was placed on the ballot, it was entitled the "Michigan State Office Amendment."

146.    Notwithstanding, Proposal B expanded beyond State offices to include federal congressional offices.

147.    Moreover, it is well-settled that State constitutional amendments with respect to state and federal offices are subject to different analyses. *See, e.g. Thornton*, 514 U.S. 779.

148.    Thus, Proposal B both (1) embraced more than a single object—i.e., *state* congressional term limits and *federal* congressional term limits, and (2) failed to express the object of the amendment in its title—i.e., described the amendment as only relating to "Michigan State Office," when it, in fact, applied to federal congressional offices.

## COUNT V
## VIOLATION OF MICH. CONST. 1963, ART. XII, § 2

149.    Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

150.    Mich. Const. 1963, art. XII, § 2 provides that ballot language for an amendment to the Constitution "shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment."

151.    When Proposal B was placed on the ballot, it contained the following savings clause: "If any part of this section is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect."

152.    The effect of including a savings clause renders Proposal B unconstitutional because including this language creates a prejudice for passing the amendment as voters will likely vote "yes" even if concerns about whether the proposed amendments are unconstitutional exist.

153.    Moreover, such language encourages the inclusion of publicly popular amendments, even knowing such amendment is unconstitutional, with other less popular

amendments so that the proposal received a majority of votes, and the inclusion of the savings clause will allow the remainder of the less popular amendments to remain in effect.

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and award (1) a declaratory judgment that Mich. Const. 1963 art. IV, § 54 violates the First and Fourteenth Amendments of the United States Constitution and the Guarantee Clause, Article IV, section 4 of the United States Constitution, (2) a declaratory judgment that Mich. Const. 1963, art. IV, § 54 violates Mich. Const., art. IV, § 24 and art. XII, §2, (3) a permanent injunction prohibiting the Michigan Secretary of State from enforcing Mich. Const. 1963 art. IV, § 54; (4) Plaintiffs' reasonable costs and expenses, including attorneys' fees; and (5) any other relief the Court deems just and proper.

Dated: November 20, 2019                          Respectfully submitted,

                                                  *Attorneys for Plaintiffs:*

                                                  BURSCH LAW PLLC

                                                  By: */s/ John J. Bursch*
                                                  John J. Bursch (P57679)
                                                  9339 Cherry Valley Ave. SE, #78
                                                  Caledonia, MI 48316
                                                  (616) 450-4235
                                                  jbursch@burschlaw.com

                                                  DICKINSON WRIGHT PLLC

                                                  By: */s/ Ariana D. Pellegrino*
                                                  Charles R. Spies (P83260)
                                                  Ariana D. Pellegrino (P79104)
                                                  500 Woodward Avenue, Suite 4000
                                                  Detroit, MI  48226-3425
                                                  (313) 223-3500
                                                  cspies@dickinsonwright.com
                                                  apellegrino@dickinsonwright.com

CLARK HILL PLC

By: */s/ Christopher M. Trebilcock*
Christopher M. Trebilcock (P62101)
500 Woodward Ave., Ste. 3500
Detroit, MI 48226
(313) 965-8300
ctrebilcock@clarkhill.com